**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Dennis Boyer,

Plaintiff,

v.

Civil No. 00-1039 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

KRS Computer & Business School,

Defendant.

---

John O. Murrin, Murrin Law Firm, Edina, Minnesota, for Plaintiff.

Barry O'Neil and Harry Kennedy, Lommen, Nelson, Cole & Stageberg P.A., Minneapolis, Minnesota, for Defendant.

---

## Introduction

Defendant KRS Computer and Business School ("KRS") employed Plaintiff Dennis Boyer as a janitor from September 1998 through August 31, 1999. In February 1999, Boyer sustained a cut while working. He received first aid from Sara Matzek, his supervisor, who, in helping him, came in contact with Boyer's blood. Boyer told Matzek that he had a blood disorder, whereupon KRS directed Boyer to undergo blood tests for hepatitis and HIV. Six months later, on August 16, 1999, Boyer gave KRS a letter of resignation, notifying KRS that his last day of work would be September 16, 1999. KRS accepted Boyer's resignation. On August 31, 1999, however, Boyer's supervisors informed him that KRS was terminating Boyer's employment effective immediately due



SEP 10 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. SEP 10 2001
DEPUTY CLERK

to an incident at the school's computer lab in which Boyer had complained to KRS staff members regarding his treatment by his supervisors and told others they should bring a class action lawsuit against the school.

Boyer's Amended Complaint alleges that KRS violated the Americans with Disabilities Act ("ADA") and comparable provisions of the Minnesota Human Rights Act ("MHRA") when it discriminated against him and ultimately terminated him because of an actual or perceived disability. (Amended Compl. ¶ 16.) Boyer alternatively contends that he was constructively discharged from his job at KRS "because of his status as either disabled or as a former drug addict."[1] (Id. ¶ 29.) Boyer also claims that KRS wrongfully terminated him after violating his right to privacy in that KRS allegedly "eavesdropped" on a private conversation "off campus" discussing Boyer's private legal matters. (Id.) In addition, Boyer asserts state common law claims for intentional infliction of emotional distress, negligence, breach of contract, and invasion of privacy.[2]

---

[1] Boyer originally contended that KRS retaliated against him for opposing disability discrimination by KRS and "speaking up" about it. (Amended Compl. ¶¶ 19, 20.) Boyer also originally alleged that he was "harassed" in violation of the ADA, the MHRA, and Minnesota's "whistleblower" statute, section 181.932 of the Minnesota Statutes. (Id. ¶¶ 25, 26.) At Boyer's deposition, his counsel stipulated on the record that the "retaliation" and "harassment" claims were withdrawn. (See infra, Analysis, part II.)

[2] Boyer argues in his opposition memorandum that his rights as a student at KRS were also violated; specifically, Boyer complains that KRS has prevented him from getting a copy of a transcript for the courses he attended at KRS and has denied him the opportunity to attend and finish courses at KRS. These facts were clearly known to Boyer before he filed suit against KRS; the Amended Complaint, however, contains no allegations or claims that KRS violated Boyer's rights as a student under the ADA or any

## Background

### I. The Parties

KRS operates a vocational school in the Knollwood Mall in Saint Louis Park, Minnesota, that provides students with training in the field of computer science. Allen Denouden, KRS's Director of Business Operations, hired Boyer to work full-time as a janitor at that location on September 16, 1998.[3] (Boyer Dep. at 141, 143; Denouden Aff. ¶¶ 1, 2.) As a janitor, Boyer's responsibilities included keeping the bathrooms clean, keeping the classrooms clean, and taking out the garbage. (Boyer Dep. at 141.) In January 1999, Boyer's hours changed from a split shift of days and nights to working entirely during the days. (Id. at 158-59.)

### II. Boyer's On-the-job Accident and the "Blood Incident"

On February 10, 1999, Boyer cut his finger with a utility knife while working. (Boyer Dep. at 196-98.) Sarah Matzek, Boyer's supervisor, helped stop the bleeding and

---

other statute. (Pl.'s Mem. Opp'n to Summ. J. at 2.) Similarly, Plaintiff argues, without any citation to authority, that he is "protected as a veteran of the U.S. Military who served in the Vietnam War." (Id. at 1.) Plaintiff also references 42 U.S.C. § 1981, although he has not asserted a claim under that statute in his Amended Complaint. (See id. at 2.) The Court will not consider on summary judgment arguments that have no basis or foundation in the Amended Complaint.

[3] Boyer learned of the position at KRS through Randy Rash, an evening education administrator at KRS in 1998. (Boyer Dep. at 143; Rash Dep. at 67-68.) Boyer and Rash discussed the janitor position over a four- or five-day period. (Boyer Dep. at 143-44.) Rash passed on Boyer's name to Denouden as a potential hire. (Rash Dep. at 17-18.) Rash and Boyer had known each other since the early 1990s, when they worked together at a restaurant. (Id. at 14.)

administered first aid and, in doing so, came in contact with Boyer's blood. After Boyer had stopped the bleeding, he told Matzek that he had hepatitis. (Id. at 73, 80-81, 205-06, 230.) Boyer disclosed his medical condition because he was concerned that Matzek had been exposed to his blood. (Id. at 74, 207.)

Later that day, Boyer met with Matzek and Tom Miller, another supervisor, and told them that he had contracted hepatitis from needle drug use back in the 1970s. (Id. at 210-11, 233.) Matzek asked Boyer to undergo a blood test for hepatitis. (Id. at 208-09.) Either in that same conversation or very shortly thereafter, Matzek also asked that Boyer be tested for HIV. (Id. at 211.) Boyer objected to having to undergo the blood tests and complained to Ken Schnitker, a top-level manager at KRS above both Matzek and Miller.[4] (Id. at 102, 215-16.) Accordingly to Boyer, Schnitker told him to just have the blood tests done and "make the issue go away." (Id. at 102-03, 402.) Boyer believed he was being told to take the test or lose his job. (Id. at 217.) Boyer had blood drawn on two occasions, one for hepatitis and the other for HIV. (Id. at 218-19, 223-24.) The test for hepatitis returned positive for hepatitis B; the test for HIV returned negative. (Pl.'s

---

[4] Boyer has presented to the Court an affidavit from KRS's former Director of Business Operations, Alan Denouden, in which Denouden avers that he worked closely with Schnitker, found his methods "disconcerting," and felt that Schnitker was "arbitrary, capricious, irrational, and unpredictable in his methods of dealing with personnel." (Denouden Aff. ¶¶ 5-6.) Denouden also avers that Schnitker's "modus operandi was consistently abusive." (Id. ¶ 6.) Evidence of a person's character or a trait of character, however, is not admissible for the purpose of proving action in conformity therewith on a particular occasion. Fed. R. Evid. 404(a). Paragraphs 5 through 8 of Denouden's affidavit are not admissible and the Court will not consider them on summary judgment.

Exs. 104 & 108.)

Boyer states that, after disclosing that he had hepatitis, his relationship with Matzek changed, and she treated him differently. (Boyer Dep. at 75.) Specifically, Boyer felt that Matzek no longer wanted or accepted his input and ideas.[5] (Id. at 76.) Boyer testified that his relationship with Matzek "went rough for a while," until late May or early June, when their working relationship began to improve. (Id. at 80, 164.)

## III. Boyer's Job Review and Salary Increase

On or about March 15, 2001, Boyer received his paycheck and noticed that it did not reflect a raise. (Boyer Dep. at 153-54.) Boyer complained to Matzek about this, stating that he had been promised a raise after six months by Denouden. (Id.) Boyer told Matzek he had a contract with the school and was supposed to get a raise after simply completing six months of employment. Matzek responded that, since Denouden was no longer at KRS, Boyer should address the issue with Schnitker.[6] Boyer tried to explain the situation to Schnitker, who responded that he was "out of the loop" as to the details of

---

[5] Shortly after the accident, Rash and Miller moved Boyer to the night shift. (Boyer Dep. at 76, 164.) On that shift, Boyer no longer reported to Matzek. (Id. at 78-79.) Boyer states that Matzek was upset that he had been moved to the night shift; she told Boyer that she wanted him back on days and then asked him which shift he would prefer. (Id. at 164.) Boyer told Matzek he felt he had been hired to work days. (Id.) After a few days of working on the night shift, Boyer transferred back to days and again reported to Matzek. (Id. at 79.)

[6] Denouden was terminated as Director of Business Operations for KRS in January 1999. (Denouden Aff. ¶ 2.)

Boyer's employment arrangement with KRS. (Id. at 194.)

On March 25, 1999, Matzek presented Boyer with a letter setting out the benefits of his position; Matzek prepared the letter because Boyer had "stated he was unaware of a letter outlining the benefits of his position." (Kennedy Aff. Ex. 10.) The letter stated that Boyer was an at-will employee and subject to a six-month probationary period. Boyer's salary was stated as $25,000 per year, with a review after six months; Boyer's performance would be monitored, with a potential that the salary may be adjusted sooner. (Id.) Boyer told Matzek he disagreed that the letter reflected the agreement he had reached with Rash and Denouden when he was hired. (Id. at 156.)

On April 7, 1999, Boyer received his first performance review from Matzek. (Boyer Dep. at 168, 170.) Matzek evaluated Boyer's performance under five criteria and also asked Boyer to assess his own performance. (Id. at 168.) Matzek ranked Boyer as "meeting and often exceeding job requirements" with respect to attendance and punctuality. (Kennedy Aff. Ex. 6.) Matzek indicated that Boyer "consistently meets job requirements" with respect to the quality of his work and his interaction and communication with others. (Id.) In two areas -- "professionalism" and "attitude/ interdepartmental cooperation" -- Matzek gave Boyer a rating indicating that he "does not consistently meet minimum job requirements." (Id.; Boyer Dep. at 171-72.) Boyer ranked himself one point higher than Matzek had on all five criteria. (Kennedy Aff. Ex. 6.) Matzek provided narrative feedback on Boyer's performance and identified areas for

Boyer to work on.[7] (Id.)

Matzek recommended a base salary increase for Boyer of $250, from $25,000 to $25,250. (Id.) Boyer told Matzek that he was not happy with the amount of the raise. (Boyer Dep. at 170.) After review by Matzek's supervisor, Kim Tamble,[8] Boyer's base salary was increased by $500, to $25,500. (Kennedy Aff. Ex. 6; Tamble Dep. at 49.) At his review, Boyer did not state that he was having problems with harassment or intolerable working conditions; nor did he indicate that he needed any accommodation for a medical condition or disability, or that he was being treated as if he were disabled. (Boyer Dep. at 176-78.)

## IV. The Terms and Conditions of Boyer's Employment After His Review

In late May, Boyer received a memo from Matzek instructing him and another janitorial employee, Sharmeen Brocks, to complete a janitorial checklist each day so that Matzek could confirm that the listed areas had been looked over and cleaned to an acceptable level. (Pl.'s Ex. 110.) In June 1999, KRS added ten more classrooms to its

[7] Matzek identified five areas for Boyer to work on, including (1) showing courteousness and respectfulness toward staff members in authoritative positions, including his supervisor; (2) making more efficient use of time "by cutting down on 'chit-chat' and by showing increased speed when completing tasks"; (3) improving his exercise of judgment "by taking into account how other people will be affected by his behavior"; (4) improving "on his understanding that a clean facility is what he provides the company, therefore, it is not up to other individuals to modify their behavior to do that for him"; and (5) improving his professionalism "by taking into account his appearance and manner." (Kennedy Aff. Ex. 6.)

[8] Kim Tamble's title at KRS was Director of Admissions.

facility in St. Louis Park. (R. Langemo Dep. at 30.) Boyer and the other janitorial staff were expected to clean these new classrooms. (See id.; Tamble Dep. at 59-60.) During the summer of 1999, Tamble informed Boyer that he would be required to wear a uniform; this requirement came as a result of complaints from students and staff members about Boyer's attire -- ragged sweatpants and t-shirts. (Tamble Dep. at 40-41.) Rhea Langemo, who succeeded Matzek as Boyer's immediate supervisor, similarly told Boyer that he would have to wear pants and either a KRS shirt or some other sort of work shirt.[9] (R. Langemo Dep. at 25.)

In late July or the first week of August, Tamble sent a memo to Boyer directing him to clean out the staff refrigerator every few weeks. (Boyer Dep. at 133-34, 339; Tamble Dep. at 58-59.) Boyer was already cleaning out the student refrigerator on a periodic basis. (Boyer Dep. at 339-40.) Boyer felt that cleaning out the staff refrigerator and rinsing out the containers was not part of his job and that such an assignment was demeaning. (Boyer Dep. at 134, 325.)

In August 1999, Boyer received a KRS Employee/ Faculty Handbook. (Boyer Dep. at 249.) The initial paragraph of the section entitled "Handbook Limitations," states in bold-faced type that the handbook "is not a contract of employment." (Kennedy Aff. Ex. 9 at 7.) That paragraph further states that "any oral or written statements or promises

[9] Matzek's employment with KRS ended in approximately June 1999. (Boyer Dep. at 79, 160.)

to the contrary should not be relied upon by any prospective or existing employee." (Id.) In the "Handbook Limitations" section, it further states that Boyer has entered into an employment relationship with KRS voluntarily:

> The Employee Handbook is not an employment contract. Employment in the state of Minnesota, unless the employer and employee enter into an oral or written employment agreement, is considered "at-will," i.e., the employer can discharge the employee at any time for any lawful reason and the employee can quit at any time for any reason.

(Id.)

## V. Boyer's Resignation and Termination

On August 13, 1999, Boyer submitted a letter of resignation stating that his last day of employment would be September 15, 1999. (Kennedy Aff. Ex. 2.) In his letter, Boyer made no complaints about how he felt he was being treated at KRS and offered no reason for his resignation. KRS accepted Boyer's resignation. (Tamble Dep. at 65.)

On Saturday, August 28, 1999, Boyer came to the school to work; he entered a computer lab where two women were present, along with three or four other people, including the computer lab supervisor, Adam Fischer. (Boyer Dep. at 302, 304.) One of the two women was a staff member in the computer lab, Angie Rumpza; the other woman was a student worker or intern. (Id. at 134-35.) Boyer states that he approached the two women and began a conversation. (Id. at 303.) In the early part of that conversation, one of the women stated that Boyer was going to have a big school to clean up, and Boyer responded, "Not me. I'm leaving. I put my termination in. I'm out of here." (Id.)

According to Boyer, one of the women asked what had happened. (Id.) Boyer states that he then stepped outside the computer lab into the hallway with the two women to continue the conversation. (Id. at 303-04.)

Boyer does not believe he brought up either the accident or "the blood incident" in his conversation with Rumpza and the other woman. He does believe, however, that he told them that the first four months he had worked at KRS had been great, and "all of a sudden, it turned around." (Id. at 305.) Boyer states that the women relayed to him problems they were having with the school and asked Boyer, "What can we do? We are powerless here." (Id. at 307.) Boyer states that he told the women that, for his own part, he was "so fed up with some of the crap here, I felt like going to the FBI." (Id. at 307-08.) Boyer then told the women "what you can do is, if you know of other people that have legitimate gripes here, legitimate complaints against this school, you guys can get together and get a lawyer and sue them." (Id. at 308.) Following her conversation with Boyer, Rumpza reported the conversation to Fischer, the lab supervisor. (Pl.'s Ex. 114.) Fischer in turn gave an account of the conversation to Tamble.[10] (Id.; Tamble Dep. at 69-72.)

On August 31, Tamble called Boyer and his immediate supervisor, Rhea Langemo,

---

[10] Tamble stated that Adam Fischer (who was working in the computer lab on the 28th) and Angie Rumpza both came to her and told her that Boyer had been having a conversation in the computer lab, in front of students and staff, trying to bring people in on a lawsuit against KRS. (Tamble Dep. at 69-72.)

into her office to speak with her. (R. Langemo Dep. at 65.) Tamble asked Boyer about the conversation on the 28th, to which Boyer responded that it was none of their business. (Id.) Tamble brought the issue to Schnitker's attention and made a recommendation that Boyer's last day be moved up to that day. (Schnikter Dep. at 146.)

In the afternoon, Boyer met with Tamble and Schnitker. (Boyer Dep. at 327, 329.) Boyer was again asked about his conversation on the 28th and again refused to discuss it. Schnitker made the decision to terminate Boyer, and Tamble informed Boyer that he was to cease work at KRS effective immediately. (Tamble Dep. at 68; Schnitker Dep. at 146.) Boyer turned in his keys, and Miller helped him pick up his personal belongings and escorted him to his car.[11] (Boyer Dep. at 328-29.)

## VI. Boyer's Charge with the EEOC

On November 17, 1999, Boyer filed a complaint with the EEOC, alleging disability discrimination.[12] (Kennedy Aff. Ex. 7.) Boyer specifically asserted that, after the on-the-job injury and the blood test incident, he was "subjected to harassing treatment" by his supervisors, his work "was more closely scrutinized" than his co-workers' work, and he was "required to do degrading jobs such as cleaning out other

---

[11] After his last day of work at KRS, Boyer continued to return to the school, particularly on weekends when managerial employees were not there. (Schnitker Dep. at 124-25.). KRS informed security for the Knollwood Mall. (Id.)

[12] Boyer did not assert a claim of retaliatory discharge either with the EEOC or the State. (Kennedy Aff. Ex. 7.)

employees' food containers." (Id.) As a result of this treatment, Boyer claimed, he was "forced to resign." (Id.) On January 24, 2000, the EEOC made a determination that, based on its investigation, it was unable to conclude that the information established a violation of the statutes. (Kennedy Aff. Ex. 8.) Boyer filed suit on April 24, 2000.

## Analysis

### I. Standard of Decision

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See

Liberty Lobby, 477 U.S. at 249. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

## II. Plaintiff's Counsel's Representations Regarding Dismissal of Certain Claims

Before determining whether summary judgment is warranted as to any of the claims in Plaintiff's Amended Complaint, the Court must first resolve which claims are actually before it. On November 27, 2000 and again on December 7, 2000, Plaintiff's counsel filed a document entitled "Amended Complaint." At his deposition on December 21, 2000, Boyer was shown the Amended Complaint, at which point Boyer's counsel, Mr. Murrin, and KRS's counsel, Mr. O'Neil, engaged in the following dialogue:

> Mr. Murrin: This may save some time because of the fact that we want to keep this case to meritorious claims –
>
> Mr. O'Neil: Yes.
>
> Mr. Murrin: – I am going to withdraw various claims. I'm going to withdraw -- if we go to Count I, that will be maintained. And Count II is okay. We will take out Count III. We will take out Count IV. Count V, we will maintain Illegal Constructive Termination and Privacy. We will take out Constitutional Law Violations.
>
> Mr. O'Neil: Let me make sure. So Illegal Constructive Termination you'll retain. You're withdrawing the rest of it, is that correct,

of Count V?

Mr. Murrin: We are just taking out Constitutional Violations out of Count V.

Mr. O'Neil: Does that include Violations of Right to Privacy?

Mr. Murrin: The Right to Privacy is an independent tort. We are keeping that in. We are keeping in Intentional Infliction of Emotional Distress. That's Count VI. And Negligence we're keeping in. That's Count VII. We're keeping Count VIII. And it's redundant but it's in. We will take out Count IX, which is Equitable Remedies, to hopefully simplify. Damages are general so we will leave that in. That might help a little bit.

Mr. O'Neil: That will help. Let me make sure I'm right. Count III has been withdrawn.

Mr. Murrin: And Count IV has been withdrawn.

Mr. O'Neil: Correct. I was going to go through them one by one. Count III is gone, which is entitled Retaliation or Illegal Reprisal. Correct?

Mr. Murrin: Right.

Mr. O'Neil: Count IV is gone, which is Harassment. Correct?

Mr. Murrin: Correct. Anywhere in any other count where there might be a retaliation or reprisal or harassment, we are taking that out.

Mr. O'Neil: I understand that. Count VI, Intentional Infliction remains in, correct?

Mr. Murrin: Correct.

Mr. O'Neil: Count VII, Negligence, remains in?

Mr. Murrin: Correct.

Mr. O'Neil: Count VII, I think, you must be retaining in. Correct?

Mr. Murrin: Yes.

Mr. O'Neil: But Count IX, as it's stated there, is also withdrawn?

Mr. Murrin: Out, right.

(Kennedy Aff. Ex. 1 at 293-95 (Boyer Dep.)). Mr. Boyer was present while Messrs. Murrin and O'Neil went through the Amended Complaint and identified which claims were being dropped.

In the memorandum opposing KRS's motion for summary judgment, Plaintiff's counsel argues that none of the claims discussed at the deposition are in fact withdrawn because he was planning, at the end of Boyer's deposition, "to be more specific about how to re-word the Complaint if counts proposed were dropped and to obtain the client's permission on the record." Murrin argues that the deposition was "prematurely terminated" by KRS's counsel in the middle of Murrin's efforts to rehabilitate his client. Therefore, in opposition to KRS's summary judgment motion, Boyer's counsel insists that all of the claims in the Amended Complaint remain viable.

Nothing in the transcript of Boyer's deposition indicates that Plaintiff's counsel's representations about withdrawing certain claims were contingent upon Boyer's subsequent consent. Boyer was present for the entire discussion and neither objected to nor questioned his counsel's statements regarding the withdrawal of any of the claims. The Court is satisfied that Boyer and his counsel are bound by the representations made during Boyer's deposition. Accordingly, the Court concludes that the parties, through

counsel, stipulated on the record at Boyer's deposition to the withdrawal of Count III (retaliation/ illegal reprisal), Count IV (harassment), that part of Count V involving alleged constitutional violations, and Count IX (requesting equitable relief) of the Amended Complaint.[13] Those claims will be dismissed with prejudice.

The Court next addresses an issue relating to the summary judgment record before the Court, namely the admissibility of the "Affidavit of Angie Rumpza," which was submitted as Plaintiff's Exhibit No. 124.

## III. Affidavit of Angie Rumpza

To establish a genuine issue of material fact as to claims involving the August 28 conversation with a KRS employee and a student, Boyer has submitted to the Court a June 5, 2001 Affidavit of Angie Rumpza, one of the participants in that conversation who, at the time, was a student and employee of KRS. At the hearing on KRS's motion for summary judgment, Defendant's counsel filed with the Court and served a July 21, 2001 "Affidavit of Evangeline L. Rumpza." In her second affidavit, Rumpza states that there are several inaccuracies and false statements in the June 5 document filed by

---

[13] Even if Boyer had not withdrawn his retaliation claim, it would be subject to dismissal because he failed to exhaust his administrative remedies with the EEOC before asserting that claim in this lawsuit. Boyer failed to indicate on his EEOC charge that he had been retaliated against in violation of the ADA, as he now asserts. (See Kennedy Aff. Ex. 7.)

To the extent Plaintiff has submitted evidence to the Court pertaining to alleged constitutional violations, alleged retaliation, and alleged harassment, the Court has not considered that evidence and declines to determine whether Plaintiff has created a genuine issue of material fact as to the withdrawn claims.

Plaintiff's counsel and indicates her wish to withdraw the June 5 document on the grounds that it was obtained under false pretenses and duress.

Rumpza describes in detail the events leading up to her signing the June 5 document. Prior to June 5, Rumpza had told Plaintiff's counsel she did not intend to cooperate with him and had asked Plaintiff's counsel and his office not to reveal her home address to Boyer or anyone else. (Id. ¶ 4.) Shortly after that conversation, Boyer appeared at Rumpza's home, first requesting and then ultimately demanding that she sign a document in connection with his pending lawsuit. (Id.) Boyer remained outside Rumpza's home for over twenty minutes; to get him to leave, Rumpza signed the document he presented and told Boyer that she wanted to talk to his counsel about it. (Id.) After Boyer left, she threw the document away. (Id.)

Within a couple of days after Boyer's visit to her home, Rumpza called Plaintiff's counsel's office:

> Mr. Murrin said that the matter would [be] settled and I would not have to be involved any further if I came to his office that day. At his office, Mr. Murrin asked me some questions and kept insisting that I sign a statement. Mr. Murrin [said] that it was "only" a signature and the continued contact from his office and any further contact from Mr. Boyer would cease if I just provided my signature. Mr. Murrin never explained to me the basis of Mr. Boyer's claims against KRS, and he suggested that I would be "guilty" of unjustly harming Mr. Boyer's legal rights if I did not cooperate. Mr. Murrin and I argued about my refusal to sign a statement, but to stop any further argument, I signed a document that had numerous handwritten revisions on it and left. Mr. Murrin advised that he would send me a copy of the declaration that I had signed when it was completed. Mr. Murrin never suggested that the declaration was being signed under oath.

(Id. ¶ 5.) Rumpza avers that she never signed the June 5 "Affidavit" in the presence of anyone who identified themselves as a notary public, nor did she sign it in front of anyone who identified herself as Linda Finn, the notary whose name appears on the "Affidavit." (Id. ¶ 3.) After talking to the other woman who participated in the August 28, 1999, conversation, Rumpza became concerned about what she had signed. (Id. ¶ 6.) When she called Murrin's office, she was told that the "declaration" she had signed could not be taken back. (Id.)

On summary judgment, the Court must view the evidence in the light most favorable to the non-moving party; however, it can consider only those facts that are properly supported in the record. See Mays v. Rhodes, 255 F.3d 644, 647 (8th Cir. 2001). "By definition, an affidavit is a sworn document, declared to be true under the penalties of perjury." 11 Moore's Federal Practice 3d, ¶ 56.14[1][b] at 56-156. A document that purports to be an "affidavit" but is not in fact sworn to and subscribed before a notary is not competent evidence on summary judgment. See Mays, 255 F.3d at 648; see also Okoye v. University of Texas Houston Health Science Ctr., 245 F.3d 507, 515 (5th Cir. 2001) (holding that unsworn statement submitted on summary judgment could not give rise to inference of discrimination); Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 443 (4th Cir. 1998) (holding that unsworn statements were not competent evidence to be considered on summary judgment in employment discrimination case);

Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 968-69 (6th Cir. 1991) (disregarding the unsworn statements of the two employees "because a court may not consider unsworn statements when ruling on a motion for summary judgment"); Garner v. Kinnear Mfg. Co., 37 F.3d 263, 268-69 & n.7 (7th Cir. 1994) (holding that affidavit was properly disregarded as incompetent because it was not notarized in the declarant's presence).

The Court has reviewed the record with respect to the June 5 "Affidavit of Angie Rumpza" and concludes that was not properly sworn to or subscribed and is therefore not competent evidence to be considered on summary judgment pursuant to Rule 56(e) of the Federal Rules of Civil Procedure. The Court will disregard the June 5, 2001 "affidavit" submitted as Plaintiff's Exhibit 124.

## IV. Disability Discrimination

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, . . . and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). To establish a claim under the ADA, a plaintiff must show that (1) he is disabled within the meaning of the Act; (2) he is qualified to perform the essential functions of the job either with or without accommodation; and (3) he has suffered adverse employment action because of the disability. Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 948 (8th Cir. 1999). The Court begins with whether Boyer has a "disability" within the meaning of the statute

. **A. Establishing "Disability"**

The ADA defines a "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The EEOC has promulgated regulations providing additional guidance regarding the interpretation of the three main components of the term "disability": "physical or mental impairment," "substantially limits," and "major life activities." See Sutton v. United Air Lines, 527 U.S. 471, 479-80 (1999) (discussing 29 C.F.R. § 1630.2(h)-(j)). The regulations state that a "physical impairment" includes

> [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine.

29 C.F.R. § 1630.2(h)(1). A "mental impairment" includes "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

The EEOC construes the phrase "substantially limits" to mean that the person is

> (i) unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) [s]ignificantly restricted as to the condition, manner, or duration under

> which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (emphasis added).[14] Lastly, the regulations provide that "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

With these principles in mind, the Court considers the two alternative grounds Boyer advances claiming that he is a "qualified individual with a disability": (1) that he has an actual disability, or (2) that he was "regarded as" disabled by KRS.[15] (Amended Compl. ¶¶ 13, 16.)

**(1) Actual Disability**

Boyer has identified the following conditions that he claims are "disabilities":

---

[14] The EEOC identifies three factors that should be considered in evaluating whether a person is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

[15] In one sentence of his opposition memorandum and at oral argument, Boyer's counsel asserted that Boyer has a "disability" because he has a "record" of an impairment substantially limiting one or more major life activities. To establish that he was disabled by virtue of a "record of disability," Boyer's "medical documentation must show that he has a history of, or has been mis-classified as having, a disability." Weber v. Strippit, Inc., 186 F.3d 907, 915 (8th Cir. 1999), cert. denied, 120 S. Ct. 794 (2000). Boyer's counsel submitted copies of various medical records for Boyer from the 1970s and 1980s, but offers no analysis demonstrating how those documents show that Boyer had a history of a disability (as opposed to simply a physical or mental impairment).

drug-induced schizophrenia, alcoholism, and hepatitis.[16] (Boyer Dep. at 8, 34.) For purposes of its summary judgment motion, KRS does not dispute that these conditions are either a physical or mental impairment. (Def.'s Mem. Supp. Mot. for Summ. J. at 15.) KRS disputes, however, whether these impairments rise to the level of being a "disability." The issue, therefore, is whether Boyer has come forward with sufficient admissible evidence from which a reasonable jury could find that one of his impairments "substantially limits" a "major life activity." The Court considers each in turn.

**a. Hepatitis**

Boyer testified that he contracted hepatitis B in late 1970 from a dirty needle. (Boyer Dep. at 210.) Boyer received treatment for hepatitis in the 1970s, and the disease is not currently "active." Boyer does, however, carry the hepatitis B virus. (See Pl.'s Ex. 104.)

Boyer's argument that his hepatitis is a "disability" within the meaning of the ADA relies on factual assertions that hepatitis B is "contagious," that it permanently changes the chemistry of a person's blood, and that a person who tests positive for the

[16] When asked in his deposition what disabilities he claims to have, Boyer also testified, "I have been a serious abuser of drugs." (Boyer Dep. at 8.) Boyer's needle drug use resulted in Boyer contracting hepatitis. (Id. at 34.) Boyer also testified that he has in the past suffered from depression, obsessive-compulsive disorder, memory loss, and "gender disability," or "bad gender dysfunction." (Id. at 36, 41.) Boyer testified, however, that he did not know whether the depression, obsessive-compulsive disorder, memory loss, or gender dysfunction had anything to do with his claims in this case. (Id. at 43-44.)

disease while asymptomatic can nevertheless experience "flare ups" of the disease at any time. (Pl.'s Mem. Opp'n to Summ. J. at 4-5.) From this factual foundation, Boyer argues that he is per se disabled [17] based primarily upon the Supreme Court case of Bragdon v. Abbott, 524 U.S. 624 (1998).[18] (Id. at 23-24.) Boyer ultimately argues that hepatitis B is in "the same category as HIV and tuberculosis" and he is therefore "clearly a qualified disabled person possessing a disease or illness which substantially limits one or more major life activities of such individual, including the restrictions this disease places on

---

[17] Boyer cites to "65 FR 38332," at which, he contends, there is "a long list of conditions that meet the qualifications of a disability" that "substantially limits one or more major life activities, including drug addiction, alcoholism, HIV disease (whether symptomatic or asymptomatic), emotional and mental illness." (See Pl.'s Mem. Opp'n Mot. to Summ. J. at 25-26.) The Court notes that 65 Fed. Reg. 38332 is found in the middle of a Federal Communications Commission regulation pertaining to terrestrial microwave radio services. The Court further notes that the Office of the Secretary of Labor has referred to the conditions of drug addiction, alcoholism, HIV disease (whether symptomatic or asymptomatic), emotional and mental illness in regulations that implement the non-discrimination and equal employment requirements of the Job Training Partnership Act of 1982. See 29 C.F.R. § 34.2. Those conditions are listed as being included in the scope of the phrase "physical or mental impairments." Id. § 34.2(1)(ii). They are not listed as being "disabilities."

[18] Boyer cites 28 C.F.R. § 36.209 and commentary in the Appendix thereto as authority for the proposition that the EEOC has declared alcoholics to be "individuals with disabilities subject to the protection of the statute" and that "addiction is a disability, and addicts are individuals with disabilities protected by the Act." (Pl.'s Mem. Opp'n to Mot. for Summ. J. at 25.) Boyer's citation is wholly inapposite for two reasons. First, the regulation was promulgated by the Department of Justice, not the EEOC. Second, the regulation does not pertain to Title I of the ADA, which prohibits employment discrimination on the basis of disabilities, but rather to Title III of the Act, which prohibits disability discrimination by public accommodations and in commercial facilities.

sexual procreation or intercourse." (Pl.'s Mem. Opp'n to Summ. J. at 24.)

Boyer attempts to expand Bragdon v. Abbott well beyond its holding. In Bragdon, the Supreme Court evaluated whether an individual with asymptomatic HIV had a "disability" within the meaning of the ADA. The Supreme Court determined, based on significant medical evidence, that HIV is, at each and every stage of the disease, a "physical impairment" for purposes of the statute's definition of disability. 524 U.S. at 632-37. The Supreme Court observed, however, that "the statute is not operative, and the definition not satisfied, unless the impairment affects a major life activity." Id. at 637 (emphasis added). The Supreme Court next considered whether asymptomatic HIV substantially limits the major life activity claimed by the respondent throughout the case – reproduction and childbearing. Id. Affirming the court of appeals' determination that reproduction is a major life activity for purposes of the ADA, the Supreme Court thereupon determined that asymptomatic HIV infection "substantially limited" that activity. Id. at 639-41. In light of that holding, the Supreme Court determined that it "need not address the second question presented, i.e., whether HIV infection is a per se disability under the ADA. Id. at 641-42.

To the extent Boyer argues that hepatitis B places restrictions on sexual procreation or intercourse, the only evidence supporting such a claim is Boyer's testimony that he believes hepatitis can be sexually transmitted. (Boyer Dep. at 62-64, 68-70.) Boyer, however, is not a doctor, and there is no competent medical evidence

before the Court that hepatitis B is a sexually transmitted disease. The Court declines to conclude that hepatitis B is "just like" asymptomatic HIV and that Boyer is therefore "disabled." Bragdon is clearly distinguishable.

As for the remainder of the record before the Court, Boyer has testified that his hepatitis did not prevent him from caring for himself in a normal way, either during the time he was working at KRS or presently. (Boyer Dep. at 54.) Nor did Boyer's hepatitis prevent him from doing manual day-to-day work in a number of jobs, including as a custodian. (Id. at 56.) Boyer's hepatitis did not prevent him from learning things "on the job" or for his job. (Id. at 58.) Nor does Boyer feel that the disease prevents him from engaging in the normal functions of day-to-day living.[19] (Id. at 59.) Upon a review of the record, including Boyer's entire deposition, the Court concludes that a reasonable jury could not find that Boyer's hepatitis substantially limits him in any major life activity.

**b. Drug-induced schizophrenia**

Boyer was first diagnosed with drug-induced schizophrenia in September 1973, and began receiving Social Security disability payments in that year. (Boyer Dep. at 9-

---

[19] Boyer stated that, because of his hepatitis, he feels that he has to be more careful in both the workplace and at home to prevent the possibility of infecting someone. (Boyer Dep. at 54-56.) Boyer has been told that he can no longer give blood. (Id. at 68.) Because of his hepatitis, Boyer believes that he cannot work as a cook, and feels that it would not be appropriate for him to work in a geriatrics area or around small children. (Id. at 64-65.) Boyer acknowledges, however, that he is capable of working in any of these areas. (Id.) This evidence does not give rise to a genuine issue of material fact as to whether Boyer is substantially limited in any major life activity by his hepatitis.

10; Pl.'s Ex. 113.) He last was treated for his schizophrenia in about 1986. (See Pl.'s Ex. 112.) Boyer received Social Security disability payments based on his schizophrenia until about 1994. (Boyer Dep. at 10; Pl.'s Ex. 113.) Boyer believes that he was still schizophrenic while he worked at KRS, but he was not taking any psychotropic medications or receiving any treatment while working at KRS. (Id. at 13, 15.)

Viewing the evidence in the light most favorable to Boyer, the Court observes that Boyer states he sometimes has difficulty in focusing on what is being asked of him. (Boyer Dep. at 14.) Boyer also states he has some memory problems at times -- he will start to do something and his thoughts get interrupted, taking his focus off of the task at hand. (Id. at 36, 44-45.) Boyer also stated that his schizophrenia sometimes affects how he relates to other people; Boyer believes that people may think he is not acting appropriately or may not understand his actions. (Id. at 45.) While Boyer's counsel subsequently elicited testimony from his client that his drug addiction "creates an impediment or impairment performing work-related matters," (id. at 370), Boyer has come forward with no other evidence – in the form of either deposition testimony or an affidavit – substantiating his claim of an impediment.

The Court has reviewed Boyer's deposition testimony and the entire record carefully, and concludes that there is insufficient evidence to permit a jury to conclude that Boyer's schizophrenia substantially limited him in any major life activity. Boyer testified that his schizophrenia did not prevent him during his employment at KRS, and

does not now prevent him, from engaging in normal daily functions. (Boyer Dep. at 51.) Boyer is able to provide for his personal needs. (Id. at 46-47.) Boyer's schizophrenia does not interfere with driving a car. (Id. at 50.) It does not prevent him from working. (Id. at 47-48.) Boyer was able to learn and be taught things while at KRS. (Id. at 49.) Boyer's testimony about the effect of his schizophrenia on his ability to perform major life activities is too vague and conclusory to avoid summary judgment. The Court concludes that Boyer's schizophrenia does not meet the "actual disability" prong of the definition of disability.

### c. Alcoholism

Boyer first became aware that he was an alcoholic in 1974. (Boyer Dep. at 15.) He has been sober and has not abused alcohol for approximately sixteen years. (Id.) During the time he worked at KRS, Boyer remained sober; he did not see a counselor for alcoholism, but did occasionally attend Alcoholics Anonymous meetings. (Id. at 16.) Boyer testified that his alcoholism did not prevent him from caring for himself in a normal way. (Id. at 52.) It did not prevent him from working as a custodian and has not prevented him from working in a broader category of jobs. (Id.) Boyer's alcoholism did not and does not prevent him from learning or interacting with people. (Id. at 52-53.) It does not prevent Boyer from driving or from engaging in other normal daily activities. (Id. at 53.) Having carefully reviewed Boyer's entire deposition and the record as a whole, the Court concludes there is insufficient evidence to permit a jury to conclude that

Boyer's alcoholism substantially limited him in any major life activity.

### (2) "Regarded As" Disabled

Having determined that there are no genuine issues of material fact as to whether Boyer is "actually" disabled by virtue of his schizophrenia, hepatitis, or alcoholism, Boyer must establish, as pleaded in the Amended Complaint, that KRS "regarded" him as being disabled. To establish a "disability" under the "regarded as" prong, Boyer must establish that he (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) does not have a physical or mental impairment as defined in 29 C.F.R. § 1630.2(h)(1) or (2), but is treated by a covered entity as having a substantially limiting impairment." 29 C.F.R. § 1630.2(*l*). Boyer has not argued that anyone at KRS mistakenly believed him to have an impairment that he did not in fact have. Accordingly, a jury could not reasonably find that Boyer was "regarded as" disabled under subdivision (3) of § 1630.2(l).

Although Boyer has not clearly articulated this theory, he appears to argue that KRS regarded him as having a "disability" because of the attitudes of others towards his hepatitis. Boyer points to the fact that Schnitker testified that Matzek was "rightfully" scared after coming in contact with Boyer's blood; in his view, hepatitis is a "scary" disease. (Schnitker Dep. at 93-94.) Schnitker had worked with people with hepatitis at

the Texas state hospital and had been instructed to be careful because it could be a dangerous disease. (Schnitker Dep. at 94.) Tamble similarly stated it was her understanding that hepatitis is incurable and can lead to death. (Id. at 53.) Boyer has failed to identify, however, in what way the attitudes of Schnitker and Tamble resulted in him being substantially limited in a major life activity by his condition. Since there is insufficient evidence to permit a jury to find that Schnitker and Tamble's attitudes resulted in Boyer being limited in a major life activity, summary judgment in favor of KRS is also warranted.[20]

The third basis for finding that KRS "regarded" Boyer as having a disability requires Boyer to establish that KRS mistakenly believed that Boyer's actual impairments substantially limited one or more major life activities when, in fact, they did not. See Sutton, 527 U.S. at 489. The uncontroverted evidence in the record is that Boyer never told anyone at KRS that he had suffered from schizophrenia or had been disabled as a result of drug-induced schizophrenia.[21] (Boyer Dep. at 10-11.) As for his alcoholism, Boyer testified he is not claiming that any of the managerial employees who allegedly

---

[20] To establish that Schnitker and Tamble's attitudes caused Boyer to be limited in the major life activity of working, Boyer must demonstrate that their attitudes caused him to be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). There is no such evidence before the Court.

[21] Boyer also had told no one that he had formerly been treated for drug addiction. (Boyer Dep. at 26.)

knew about his alcoholism discriminated against him on the basis of that condition. (Id. at 20-21.) With respect to the hepatitis, Boyer has identified a number of persons at KRS who knew he had the disease. (See Boyer Dep. at 28; Rash Dep. at 45-46; R. Langemo Dep. at 75.) However, there is no evidence that anyone who knew of Boyer's hepatitis believed that it substantially limited him in a major life activity. Accordingly, summary judgment in favor of KRS is also warranted.

Having concluded that Boyer has failed to establish that he either has an actual disability or was regarded as having a disability by KRS, the Court determines that Boyer cannot satisfy the first essential element of his prima facie case of disability discrimination. Accordingly, the Court declines to reach the question of whether Boyer has succeeded in establishing a genuine issue of material fact as to whether KRS took any adverse employment action against him because of a disability.

### B. The Blood Tests for Hepatitis and HIV

Boyer has also pleaded, although fairly obliquely, that KRS violated the ADA when it directed him to submit to a blood test for HIV after the on-the-job accident and his disclosure to his supervisor that he had contracted hepatitis from intravenous drug use.[22] (Amended Compl. ¶¶ 9, 10, 12 & 13.) Section 12112(d)(4)(A) of the ADA prohibits an employer from requiring a medical examination from an employee (whether

---

[22] In his Charge of Discrimination with the EEOC, Boyer also asserted that he was forced to submit to an HIV blood test over his objection. (See Kennedy Aff. Ex. 7.)

disabled or not) and from making "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Based on the record before the Court, however, there is a fatal problem with Boyer's "blood test" claim.

As the plain language of the statute provides, an employer may require a medical examination from an employee or make inquiries regarding an employee's possible disability where the examination or inquiry is "shown to be job-related and consistent with business necessity." The undisputed evidence shows that KRS asked Boyer to submit to blood tests for hepatitis and HIV only after an on-the-job accident in which fellow employees came in contact with his blood and only after he disclosed that he had a blood disorder. In EEOC v. Prevo's Family Market, Inc., 135 F.3d 1089 (6th Cir. 1998), reh'g and suggestion for reh'g en banc denied, (Apr. 23, 1998), the Sixth Circuit Court of Appeals held that a food store's request for a medical examination of an alleged HIV-positive produce clerk was job-related and consistent with business necessity. The plaintiff had announced he was HIV-positive and his job included frequent cuts and scrapes from using knives for cutting produce. Accordingly, the court of appeals concluded that the store had a legitimate business concern to protect the health of the plaintiff, its other employees, and the general public.

Here, Boyer disclosed that he had a blood disorder to his supervisors because he

was concerned that Matzek had come in contact with his blood. David Langemo, who cleaned Boyer's blood up from the floor, also came in contact with Boyer's blood. Given that KRS had a legitimate business concern to protect the health of its other employees, there is no genuine issue of material fact that the tests Boyer was directed to take were not job-related and consistent with the employer's need to ensure employee safety. This claim fails as a matter of law.

## V. Constructive Discharge

Boyer alleges that KRS made his working conditions so unbearable because of his disability that he was forced to tender his resignation on August 13, 1999, and, hence, was constructively discharged. For purposes of evaluating this claim, the Court assumes for the moment that Boyer was able to show that he was "disabled" within the meaning of the statute. Boyer's constructive discharge claim nevertheless fails.

An employee is "constructively discharged" if an employer deliberately renders the employee's working conditions so intolerable that the employee is forced to quit. Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 932 (8th Cir. 2000); Henderson v. Simmons Foods, Inc., 217 F.3d 612, 617 (8th Cir. 2000). "The employer's actions must have been intended to force the employee to quit. The plaintiff can satisfy the intent requirement by showing that his resignation was a reasonably foreseeable consequence of his employer's discriminatory actions." Tatom, 228 F.3d at 932 (citing Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 796 (8th Cir. 1996.) An employee's dissatisfaction with his working

conditions does not establish a constructive discharge. Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 496 (8th Cir. 1996). Rather,

> the plaintiff must demonstrate that a reasonable person would find the working conditions intolerable. The intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings; the question is whether working conditions were rendered so objectionable that a reasonable person would have deemed resignation the only plausible alternative.

Tatom, 228 F.3d at 932 (emphasis added).

KRS argues that summary judgment on this claim is warranted because Boyer has failed to come forward with evidence from which a jury could find that his working conditions were objectively "intolerable" or that he suffered extreme and outrageous conduct while employed at KRS. Boyer complains that KRS imposed the following "intolerable" terms or conditions of employment on him: (1) he received a "disappointingly small" raise; (2) he was required to wear a uniform; (3) he was required to clean ten additional classrooms; (4) he was required to clean the staff refrigerator; and (5) he was required to fill out additional paperwork, such as a checklist of tasks performed and expense reimbursement requests.[23] When asked in his deposition about his claim that KRS had treated him intolerably, Boyer made the following statements:

> Q. I want to make sure I'm clear and understand something. You started out saying that maybe you were wrong about that. Is what

[23] Boyer also asserts that he "used to have support staff help him with things, but after the blood incident, he did not have assistance in these areas any more." (Pl.'s Mem. Opp'n to Summ. J. at 12.) The record citation Boyer provides, however, does not substantiate that assertion.

you mean, some other people may have been able to tolerate things –

A. Yeah.

Q. -- that were happening to you on the job?

A. Maybe they could have, yeah.

Q. But you, personally, felt by that point it had become intolerable after Sara [Matzek] had left. Correct?

A. Yeah. . . .

(Boyer Dep. at 298-99.) As for being subjected to ridicule and harassment, the only evidence Boyer has presented to establish this allegation is the June 5 "Affidavit" of Angie Rumpza, which the Court has determined is not competent evidence. (See Pl.'s Mem. Opp'n to Mot. for Summ. J. at 10.)

The Court determines that no reasonable jury could conclude that Boyer's resignation was a reasonably foreseeable consequence of the changes in Boyer's working conditions during the summer of 1999. Boyer's assertion that his working conditions were "intolerable" are based on his subjective feelings alone. His dissatisfaction with his working conditions is not sufficient to establish a constructive discharge. Accordingly, summary judgment will be granted on the constructive discharge claim.

## VI. Minnesota State Common-law Claims

### A. Intentional Infliction of Emotional Distress

Boyer alleges in his Amended Complaint that "[b]ecause of his physical condition,

he became the object of severe and unconscionable ridicule, harassment, and emotional distress." (Amended Compl. ¶ 32.) Boyer argues that, as a "vulnerable adult," he was treated inhumanely by his supervisors at KRS, and was forced to quit because of this inhumane treatment. Boyer also complains that KRS "eavesdropped" on a private conversation in order to force him out even two weeks before the last day he had planned to work.[24] (Pl.'s Mem. Opp'n to Mot. for Summ. J. at 30.) None of these allegations supports a viable claim for intentional infliction of emotional distress.

"Under Minnesota law, a plaintiff must prove the following elements to make out a claim of intentional infliction of emotional distress: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the conduct must cause emotional distress; and (4) the distress must be severe." Boone v. Federal Express Corp., 59 F.3d 84, 86-87 (8th Cir. 1995) (citing Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 439 (Minn.1983)). To constitute "extreme and outrageous" conduct, the defendant's actions "must be 'so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.'" Hubbard, 330 N.W.2d at 439 (quoting Haagenson v. National Farmers Union Prop. & Cas. Co., 277 N.W.2d 648, 652 n. 3

---

[24] Boyer also complains that KRS obtained a trespass notice from the Bloomington Police Department in order to ban Boyer from coming onto KRS's premises in Bloomington. The Court notes that the trespass order was not served on Boyer immediately after his termination, as Boyer has suggested in his memorandum; rather, the Bloomington Police Department served the trespass order on Boyer on September 21, 2000, after this lawsuit was begun. (See Pl.'s Ex. 125.)

(Minn. 1979)).

When asked what severe and unconscionable treatment he suffered at KRS, Boyer stated, "I wasn't getting respected. I was getting treated pretty much like every day dirt." (Boyer Dep. at 312.) Such a vague and conclusory description does not give rise to a genuine issue of material fact as to whether KRS's conduct was "so atrocious that it passes the boundaries of decency." Similarly, the working conditions Boyer complains about, detailed in the preceding section, do not rise to that level. Even assuming for the sake of argument that the treatment Boyer received was "extreme and outrageous," however, there is no evidence before the Court that the distress Boyer allegedly suffered was "so severe that no reasonable [person] can be expected to endure it." Hubbard, 330 N.W.2d at 439. In fact, as noted in the previous section, Boyer acknowledged that other people may have been able to tolerate the working conditions he had experienced; it was merely that Boyer "just had a belly full." (Boyer Dep. at 297-98.) Summary judgment on the intentional infliction claim is warranted.

**B. Negligence**

Boyer alleges in his Amended Complaint that KRS "negligently retained, trained or supervised their employees in the proper treatment of an individual like Plaintiff." (Amended Compl. ¶ 35.) In his memorandum opposing summary judgment, Boyer changes the basis of his negligence claim. Boyer no longer contends that KRS was

negligent in its training, supervision or retention of employees.[25] Rather, Boyer claims, KRS was simply negligent in its treatment of him. (Pl.'s Mem. Opp'n Mot. for Summ. J. at 30-31.) Although Boyer states that "[t]here were a lot of duties breached," he identifies only one -- the duty of good faith and fair dealing. (Pl.'s Mem. Opp'n to Mot. for Summ. J. at 31.) To the extent Boyer has asserted a claim for breach of contract, the claim for breach of an implied duty of good faith and fair dealing cannot be maintained. See Hunt v. IBM Mid Am. Employees Fed. Credit Union, 384 N.W.2d 853, 858 (Minn. 1986)

The remainder of the "duties" are in fact a panoply of "rights" that Boyer claims were violated, including "the right to frequent one's school premises, the right to be harassment free on a school campus or work environment, the right to a job when one performs his job, the right to take classes in a publicly funded school, the right to assemble and to speak one's mind in public places (here Knollwood Mall), and the right not to be eavesdropped upon." (Pl.'s Mem. Opp'n to Mot. for Summ. J. at 31.) All of these alleged breaches of duty are duplicative of causes of action that are dealt with elsewhere in this opinion and, as those claims are being dismissed as a matter of law, so

---

[25] When asked in his deposition what information Boyer had that an employee at KRS was negligently retained, trained or supervised, Boyer said he believed KRS was negligent in that its managers were not responsive towards him. (Boyer Dep. at 314.) He objects that his supervisors did not call him in to talk with him about performance issues, but rather sent him memos that he interpreted as indicating that he was not doing his job properly. (Id.) Boyer admitted, however, that he was not on a performance plan before he resigned. (Id.) Boyer has failed to assert the essential elements of a claim for negligent retention, training or supervision.

too is the negligence claim.

## C. Breach of contract[26]

Boyer alleges that KRS breached an oral employment contract with him when it (a) terminated him approximately two weeks before his one-year anniversary date; (b) made him wear a uniform; (c) required him go through a performance review; and (d) conditioned his raise on the results of his performance review. (See Boyer Dep. at 120, 145, 149, 384.)

To establish that an employment contract is not terminable except for cause, the plaintiff must establish that his employer clearly intended to create such a contract. Pine River State Bank v. Mettille, 333 N.W.2d 622, 629 (Minn. 1983). The employee's "subjective impressions and assumptions are not relevant for purposes of ascertaining contractual terms." Hunt, 384 N.W.2d at 857. Aside from Boyer's own subjective belief that he had a one-year term contract and was not an at-will employee, there is nothing from which a jury could find KRS intended to create such a contract. Denouden does not confirm in his affidavit (which Plaintiff submitted in opposition to summary judgment) that he and Boyer agreed to any of the terms that Boyer claims were part of his "contract."

---

[26] Boyer alleges in opposition to summary judgment that KRS also violated section 181.55 of the Minnesota Statutes by failing to have a written contract of employment. Boyer did not put KRS on notice in his Amended Complaint that he was alleging a violation of Minn. Stat. § 181.55, even though the facts underlying such a cause of action were well known to Boyer at the time he instituted this lawsuit. The Court will not permit Boyer to amend his Amended Complaint through his summary judgment papers. Such a claim will not be addressed.

Furthermore, Rash affirmatively testified that Boyer was not offered a one year contract. (Rash Dep. at 18.) As for the alleged terms of his contract regarding a raise, the Court notes that they lack any specificity: Boyer has come forward with no evidence regarding the amount of the raise he was to receive.

Absent an express employment contract, an employee in Minnesota is presumed to be an at-will employee. Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1209 (8th Cir. 1997). As such, the employee may be terminated at any time for no reason at all. Id. There is no genuine issue of material fact as to whether Boyer was an at-will employee. Accordingly, Boyer's termination on August 31, 1999 was not a breach of contract. Summary judgment on this claim is warranted.

### D. Right to privacy

Boyer's "violation of a right to privacy" claim is premised on the notion that KRS electronically eavesdropped on his conversation with Angie Rumpza and another staff member in the hall of the Knollwood Mall. The only evidence supporting an inference that KRS "eavesdropped," however, is Rumpza's June 5, 2001 "Affidavit," which the Court has determined is unsworn and not competent evidence, and which Rumpza herself has repudiated. The remaining evidence in the record establishes that Boyer's supervisors learned about Boyer's conversation with Rumpza because Rumpza told Fischer and Tamble about it. As a matter of law, Boyer's "right to privacy" claim fails.

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED THAT** Defendant's Motion for Summary Judgment (Doc. No. 24) is **GRANTED** and Plaintiff's Amended Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 10, 2001

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES: **SEP 1 0 2001**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*